Well, Mr. Lichten, it's an enviable practice you have that gets you in front of us on significant cases every month. We saw you a month ago. Thank you. My name is Harold Lichten. I have the pleasure to represent the plaintiffs in this case. There are three fundamental legal errors which were made by the district court in this case, even if one accepts that, in certain instances, the F quad A preempts prong two of 148B. First, the court's decision that prongs A and C are not severable from prong two violates not only decisions of the SJC, but the Massachusetts legislature's clear mandate, Chapter 4, Section 611, that where sections of a statute can be severed where possible, they should be severed, and that, quote, parts of the statute are capable of separation, where parts of doing so comports with the legislative intent. If ever there were a statute where severance would be appropriate, it would be in this case because of the conjunctive nature, the three-part nature of the test. Mr. Lichten, somewhere in your papers is an argument that you didn't have a fair chance to brief the severability issue in the district court. Are you now waiving that argument? Yes. Or no? The answer is yes. Because I think this is so clear-cut under the law and under the Massachusetts legislature's intent, both with respect to 148B and its intent that statutes be severed where possible, that I don't think there's any need for a remand because I think it's clear on its face. If we knock out two and leave one and three in place, are we going to be okay in terms of not watering down Massachusetts law more than – in other words, what's the relationship between 148B and the background common law? Does it preempt or does the common law still stay in place in Massachusetts? The A and C tests are somewhat more favorable tests, although they're common tests throughout the country with respect to the question of whether someone's an independent contractor or not. The common – In what ways is it more favorable than the common law? Sure. C looks at the question of whether or not someone is really an independent contractor or not, whether they have an independently established trade or business separate and what they're doing. That's very similar to the economic realities test, which is used in the FLSA, and very similar to statutes – statutory tests, which are used across the country. That test is – the FLSA is considered a more favorable test for employees than the common law. The common law uses multiple factors, many of which are not even relevant in today's economy, and I think the C test and the A test envision what states all around the country have come to use for their statutory tests for wages. And again, if ever there were a statute which is capable of severance, it would be this one where A and C form a whole, they're clear on its face, they can be easily applied, and many states have essentially A and C statutes. So you're – it'd be very simple. Secondly, this court's holding should be reversed, because again, without any briefing, the court held that in any event, prongs A and C are preempted by one – are preempted by the F-Quad A, and that holding is clearly, clearly at odds with your decision in MDA and doesn't involve at all the evil that you were – that you say you were addressing in the MDA decision, which is that the second prong of 148B would make it improper to use any type of independent contract relationship. Well, didn't you say that – well, at least one view of that is make it almost impossible to – you do an independent contract. Exactly. Well, that's what this court said in MDA, and that's what the defendants have been saying in all these cases, that it's the prong two which would prevent them from using any type of independent contract or relationship. Why would we reach the severability question without reaching the prong two question? The other parts of the case aren't teed up yet. They have – you haven't had any ruling on them. There's no finality about it. Do you agree that we should be reaching prong two before we reach any question of severability? And do you agree that if we reach prong two, that then we have to reach the question of severability? Yes. I think although we did not get an opportunity to brief it properly, it was raised I think only in the reply brief. I think there's no reason why the court doesn't have enough in front of it to deal with this issue, which is an important issue in cases throughout the Commonwealth and throughout the United States, as to whether or not prongs A and C are preempted on their own. When you say A and C, are you talking about A1 and A3? Yeah, I call them A and C, because we call it the ABC test. That's how people – Okay. But we're looking at a statute, and I think if I understand it, you're saying we should first decide whether A2 is preempted, like the district court did, and if we do decide that it's preempted, we should then proceed to decide the severability issue. Yes, that's correct. So, do you want to go back to 2 and tell us why you disagree with the district court's decision? Yes. First, just let me finish up the point. Our position is that A and C clearly remain, even if you find prong 2 preempted, because A and C do none of the mischief which you were concerned about in MDA, and if you were to find that preempted, you would be basically saying that any state wage law, since most states use a combination of an A and C test – Oddly enough, I don't think those issues are in front of us. There has been no district court decision on independent grounds other than severability. With all respect, Your Honor, I believe that Judge Stearns, in our case, did say that he found – They would be anyway. What? Yes, that they would be – Anyway. Yes. Okay. With respect to prong 2, this case is fundamentally different than the case that you reviewed in MDA. Unlike MDA, where the plaintiffs made a showing based on logical inferences that their type of on-demand, same-day delivery service could be – have a significant – could be significantly impacted in terms of its service and routes by making the company treat the workers as independent contractors, that is not the case with FedEx's model. Now, you obviously know about FedEx's model because state after state and court after court has found that these workers who work every day, same day, delivering on a fixed-route basis, delivering in FedEx uniforms to stores and businesses and residents, there is not – FedEx has made no showing whatsoever that there's anything about that arrangement that would cause a significant impact on their prices, routes, or services. Why wouldn't that? Why? Simply because they would not be able to use independent contractors. That would change how they probably are going to have to price. It would change how they were going to have to employ. It would change their long-distance model. Why – There is no long-distance model because the workers we're talking about are workers who pick up at a terminal in the state of Massachusetts and deliver to a fixed route that they drive in Massachusetts. As I read your decision in MDA and as I read the case law, there has to be a showing of significant impact on prices, routes, or services. In this case, FedEx never tried to make that very showing that the defendants in MDA spent What do you say about DFIORI? Because DFIORI, it hinged, as I understand it, on you can't dictate how a sign is done on tips. And then here, as I understand it, your argument on the merits is that 148BA2 essentially precludes FedEx from requiring that those who drive the trucks own the trucks. No. I'm not saying that they couldn't own the trucks. You have people in law firms, paralegals, lawyers that own their own cars and do their driving. There's nothing that prevents FedEx from asking the drivers to use their own trucks. There may be requirements on how they get reimbursed for that. Yeah, but that's what this case is about, isn't it? It's reimbursement for equipment costs. It is not about a basic wage structure. That's not true, Your Honor. And the reason that's not true is because what we know from the SJC decisional law under Chapter 149, Section 148, is that in Massachusetts, you cannot improperly deduct monies from people's checks. In this case, and this was one of the proceedings before Judge Stearns, there were deductions from wages that were significant for things like workers' comp, uniforms, and things like that. What has not yet been decided by the SJC, but was before the SJC when Judge Stearns reversed himself in this case, is the question of whether there are any reimbursement of expenses required under Chapter 149, Section 148. We don't know the answer to this, but the main argument of the plaintiffs in this case was that those deductions were unlawful. And it's hard to see how that affects routes and services. And to the extent it affects prices, it does so only marginally. And as you said in De Fiori and as you recognized in MnDONCA, the fact that there may be a slight price increase is not enough to invoke F-Quad A preemption. No. No. Thank you. Thank you. Mr. Sachs. Good morning, Your Honors. Peter Sachs, State Solicitor for the Amicus Massachusetts Attorney General. Prong 2 of Section 148B is not preempted because it affects only how FedEx pays its drivers for the services that FedEx chooses to offer and the over the routes and at the prices FedEx chooses based on free market forces. Section 148B doesn't dictate or have any significant impact on FedEx's choice of those prices, routes, and services. It's the market that decides, which is exactly what the goal of Congress was in trucking deregulation and in F-Quad A's preemption provision. Section 148B determines only whether drivers Counsel, from the point of view of the Attorney General, are there alternate tests under the federal preemption statute? Is directness a separate test from showing an effect on services, prices? Well, this Court and the Ninth Circuit have recognized that even indirect effects can be sufficient, so we don't contest that. But the type of indirect... But in De Fiori, doesn't that case turn on a finding of directness of regulation? Yes. De Fiori said that the TIPS law there amounted to a direct regulation of prices and how services were offered. This case is quite different. All FedEx has said is that having to pay its employee, having to pay its drivers, who it chooses, it can choose whoever it wants as drivers, having to pay them as employees under Chapters 149 and 151, which are the only laws that 148B triggers, would somehow affect its business model. How does that... How does that... Does that make it impossible for them to use the business model that they have of using people who they view as independent contractors using their own trucks, owning their own routes, which they can buy and sell and so on? Doesn't that regulation be... Doesn't that, in effect, preclude that from being done in all practical terms? Well, we're not contesting that Prong 2 makes it difficult, if not impossible, to hire individual drivers and treat them as independent contractors rather than as employees. But you're saying that has no effect. Because the FQA does not speak of state, preempting state laws that relate to business models. It speaks of preempting state laws that relate to prices, routes, and services. And there is no evidentiary showing and no logical effects showing that this law affects prices, routes, or services. Under your interpretation, can FedEx impose the economic risks and benefits of greater or lesser depreciation in the trucks on the drivers? Or does FedEx have to shoulder it? That's how I read the complaint, is an attempt to, under the present business model, the driver bears the risk that something happens to the truck. Well, our position is not so much on the specifics of the allocation of costs, but merely that FedEx must show a significant impact on prices, routes, or services. And under DFIORI... So under your interpretation, then, could FedEx still leave the economic risks inherent in truck ownership on the drivers and comply with two? Well, that was a matter that was being briefed before the SJC on certification from the district court when Judge Stearns reversed himself after this court's MDA remand. But DFIORI says that... Pardon me, before you move on, you must have formed a position on that question. The Attorney General of the Commonwealth in the SJC, which has asked that question, and you have no answer for us? We were preparing to file an amicus brief in that case in the SJC, but it became... Judge Stearns reversed himself, and those questions were withdrawn before we did so. So I'm afraid I do not have an answer on the specifics of that question. But I don't think it's relevant to whether 148B Prong 2 is preempted, because this court in DFIORI said that the preemption dividing line is between those laws that affect a carrier in its capacity as carrier versus those that affect it in its capacity as employer or proprietor. And this is clearly on the employer side of the line. The Ninth and the most recently the Eleventh Circuit in Amerijet have followed DFIORI and so has the Seventh, and we would urge this court to apply that same dividing line here and hold Prong 2 not preempted. I'm still puzzled. These cases, as I understood the ruling in these cases, it turned in part on the specific complaint is asking the court to apply subsection 2 to shift the burden of truck ownership back onto the employer, as you would if they're employees, rather than on the drivers, as you would if they're independent contractors. And it seemed to me that was one of the main reasons the court found preemption. And you're now telling us you don't take a position on that specific issue. Unfortunately, the court never went through that analysis, Your Honor. The court said it's preempted because it affects FedEx's business model. It never drew the specific connection to the driver. Well, let's assume that's how we read it, that the business model it's talking about is using a model where the drivers have a self-built-in incentive to maintain the trucks as best possible because they bear the economic risk of any unusual depreciation. If that's the business model, the judge said this is preempting. There would still have to be a showing that that kind of incentive affects, from the customer's standpoint, the prices, routes, or services they receive. There's no showing, and one cannot infer that as a logical matter. When a FedEx driver comes to the door and delivers a package, the customer cannot tell whether that driver is an employee or an independent contractor. So there's no significant effect on the services shown in this record. And for that reason, Judge Stern's opinion, which skipped over this specific analysis of prices, routes, and services that this court suggested in MDA 2, for that reason, his decision should be reversed. Part of the rationale for the decision in MDA was that the Attorney General, as I recall, had a 56-F affidavit out there saying that they wanted a chance to see what other facts might be developed. Am I correct? Yes. And you think that has no significance here? There, you are asking us not to resolve the ultimate question because you wanted to have more facts. Well, FedEx isn't arguing that it needs more facts to show the effect on its prices, routes, or services here. No, but you seem to be quite certain that there is a particular test that emerged from MDA. No, I'm suggesting that MDA recited, I think, what's an accepted test, that there must be a significant effect on prices, routes, or services in that particular case. We wanted an opportunity to go back to the district court. FedEx has put its best case forward. It has not come up with specific evidence or a logical argument that treating its drivers as employees solely for purposes of Chapter 149 and 151 would affect the way it delivers its services. So, as I understand it, you are taking the position no additional facts are needed to decide this question. As amicus, I'm not sure I have standing to take a position, but I don't see anything in FedEx's briefs that says we want more of a chance to show how this affects services. They put their best foot forward. And it's not an argument the Attorney General wishes to make because you haven't? No. You say how it pays. We shouldn't worry about how FedEx pays its workers. That's beyond the concern that goes ahead. But what about the relationship of its workers as to whether they are employees or independent contractors? Well, that doesn't inherently affect how FedEx delivers prices, routes, or services. Whether it pays its drivers as employees or as independent contractors doesn't necessarily affect the services that the customers receive. As I said, they can't tell the difference. There's no definite showing that it affects price. And even some indirect influence on price would not be enough to cause preemption. Otherwise, state fuel taxes would be preempted. And we know conclusively from the legislative history that Congress had no intent to do that. State minimum wage and prevailing wage laws would be preempted. And we know that at the time Congress was passing the F-Quad-A, it said there are ten states that don't regulate interstate trucking. They weren't worried about those states. And eight of those states had either prevailing wage laws or minimum wage laws or both. So we know that was not within Congress' concern when Congress passed the F-Quad-A. We're not saying that some economic effects of a law like this couldn't on some set of facts be so acute that it would effectively dictate prices, routes, or services. We're not taking a categorical, no preemption of labor laws approach. But certainly that would have to be a very strong showing and no such showing has been made here. Thank you. Thank you. Mr. Jay. Thank you, Your Honor. May it please the Court, William Jay for FedEx Ground. Prong? Speak up. Of course. The only two things the Court needs to decide are whether Prong 2 is preempted because it has a significant effect on prices, routes, or services, and whether subsection A of section 148B is not severable. If the Court agrees with the district court on both of those points, it can simply be affirmed. Nothing else to do. And what specifically, what's your best argument to counter what you just heard in terms of what significant effect does this have on either a price, a route, or a service? Sure. I'll jump right to that, Judge Carnado. I think that it's seen most clearly in the fact that FedEx Ground has never been engaged in the business of first mile or last mile pickup and delivery, and it has never been engaged in the business of owning its own trucks, maintaining them, storing them overnight, taking care of fuel, and so on. I still didn't hear a reference to either a price, a route, or a service in some effect. The effect, Judge Cate, is that the Massachusetts law would require FedEx Ground to get into these two businesses that I've just referred to and provide a service that it is not currently providing. Okay. So when I contract now with FedEx to get a package to my sister in Dallas, FedEx isn't providing that service to me? FedEx is providing you a service, but the Massachusetts law would fundamentally change the nature of that service. How would it change it? Would you agree it wouldn't change it in any way that's visible to me? Perhaps not at the level of each individual customer, although I think even there, the drivers have ownership of their routes. They develop relationships with their customers. They have incentives to secure better customer service and to develop more business along their routes. They can make arrangements about particular pickup times, particular accommodations that customers require. That's why FedEx Ground adopted this model to align the incentives of the company and the driver right down to the street level, and what the Massachusetts law would do is say that you can't do that. What the plaintiffs are asking for is to require FedEx Ground to, for example, incur the expense of purchasing the truck. The record indicates that a number of the FedEx Ground drivers in the same position as the plaintiffs would, for example, not store their trucks at the FedEx Ground depot overnight. What evidence is there in the record on that? I've seen speculation in the briefs, but is there any evidence in the record that the vehicles would change? Page 516 of the record is the testimony that FedEx Ground home delivery drivers often took their vehicles home at night. Now, what I think, what I can't point you to is an expert who says, I predict that if Massachusetts law is brought to bear in this way, that will change, but I think that what this court has said is that you look at the real and logical effects, and requiring that you pay for each and every aspect of vehicle ownership and maintenance, I think it doesn't require a contentious inference to get there. Well, how does that tell me where the vehicles are going to be stored overnight? There's nothing in the record on that point at all. I think you're on... And that's the contingent, that's the nexus that you drag in the route, because you say if they couldn't store them at home, they'd have to go to the barn, therefore they'd have to start at the barn. But there's no evidence in this record. I think that's just one point, Judge Katta, and I think it goes fundamentally to the fact that... But that's a point we can now put aside, because there's no evidence in the record at all that they would have to be kept at a different place than they are now. Well, respectfully, Judge Katta, I don't think you can simply put it aside because of the need to draw the inferences that are appropriate and logical, and I think that... And why is it logical to assume where, I mean, why would they change where they keep the trucks at night? No one, no witness has told us any reason. I can't tell you that a witness has said that FedEx Ground would begin changing what happened to the trucks overnight, but I think that more fundamentally, if FedEx Ground were required to own all the equipment that it does not currently own, and take charge of what is currently a matter that's between individual drivers, and this is spelled out most clearly in the Quorum Affidavit, Quorum Declaration that begins at page 520 of the record, that individual drivers make their own allocation decisions about who's going to deliver particular packages in particular order on particular days. They do that because they are trying to develop their own business. There are incentives built into the compensation model to ensure that they do that. That's how FedEx Ground... This is another service point that I wanted to get to. Can I interrupt just for a minute here, just for my own edification? Let's assume at the end of the day a driver has a truck which isn't operating properly. Does that driver take the truck home to get it repaired, or does FedEx repair it, and charge them for it? How does that happen? If you look at the Quorum Declaration that I referred to beginning at page 520 of the appendix, Your Honor, you'll see that Mr. Quorum, who was a contractor who owned multiple routes, he had people working for him, doing driving for him. He only drove himself part-time. He says in his declaration that he would make his own arrangements for maintenance and repair because he knew people, he could get a better deal on the repair. And so that's one way in which his incentives were aligned with the company's. He has to maintain the truck in good working order. If he can do that more cheaply, he gets to keep more money. But he could also use FedEx to do that. I believe that that's right, although I don't think the record speaks to that. But we know that he's certainly not required to do anything like that, and the same thing is true for fuel and related expenses. It seems you're asking us to come up on our own with a lot of inferences when logic is telling me if those inferences were true, FedEx would have said it in an affidavit in the record. So, for example, when we ask what is the effect on price routes or services, I keep hearing you tell us, well, here's what the effect would be on FedEx's business model, and it would change the business model. Let's take that as a given. I think you then need to get us to the next step of showing how that would mandate enough to have a significant effect on price, route, or service. And that's where I'm asking whether the record here is a little skinny on what that connection would be. Let me add two or three more things. In addition to having to provide first and last mile service through its own employees, in addition to owning the trucks and having to take on the incidence of ownership, the record does discuss the way in which FedEx ground uses its current model to respond to varying conditions. It provides the needed flexibility. It allows the contractors, at the level of individual drivers, to decide how individual packages are going to get delivered each day. They make those route planning decisions. FedEx ground would have to do that. More significantly, FedEx ground would have to, under circumstances where the service that's needed is, we need to get all of these packages together delivered today at times of peak need, perhaps unexpected peak need. Right now, the way the business model works is that drivers have incentives to sign up, to take on additional responsibility and deliver more packages. They can even work that out between each other. This is in their record. It's in, among other places, the Corn Declaration and also, I think, the Neil Declaration. One reason that they can do that is that the individual contractors can work for other people at the same time. The reason that they can have the resources able to be brought to bear when there's a situation of peak demand is that they're not necessarily sitting around waiting for FedEx ground all day. They can do other work with their trucks, covering up the decals, driving on their off hours. Mr. Corn is a good example of that. His drivers did that. He had a separate business with his own name. All of those indicate how the change to a system where FedEx ground can only provide service through its own employees would be different. What about contracting with other companies for the last mile? The reason that that would be okay, I think, is because the independent contractor statute, section 148B, refers to contracting with an individual. While the company is allowed to contract with non-individuals, I think that that's really a quirk of the Massachusetts statute. The fact that FedEx ground would have to make a significant change is itself, I think, an indication of why there is a significant impact in not being allowed to work directly with an individual. How is that? Again, you just said the fact that there would be a change in the model, then we should then infer some change in price, route, or service. Again, I go back to the Corn affidavit. I don't see him making that leap that then says if you went to that model of hiring corporations for the last model, the price, routes, or services would then be different in the following way. He does not say that, Your Honor. The evidentiary record does not contain an expert or someone making that predictive judgment. I don't think that we need that under this Court's decisions, and I think that in both this Court's decisions and the Supreme Court's decisions, I think that the Court having before it a fully developed evidentiary record on how FedEx ground's current model works can make its own predictive judgment about it. Would your client know better than anyone on the planet whether there would, in fact, be an effect on price, route, or service in exactly what it would be? Presumably, Your Honor, and I'm attempting to explain what that would be, but what I can't do is tell you that there are record affidavits that are saying what I, a lawyer, am now saying to you in this courtroom. And before we throw a state law out as preempted when FedEx says it would affect price, routes, and services, why wouldn't it be reasonable to ask FedEx to explain exactly what the impact on price, routes, or services would be as opposed to saying here are the impacts on our business model, and then you, Court, can infer from logic what the impacts would be? Well, I think, Your Honor, respectfully, we have spelled it out. I understood your question to be why haven't we done so through record evidence. That's usually what we use. In these cases, Your Honor, this Court has specifically said, and I said it in the MDA case, that there's not a requirement to come forward with that sort of expert or other evidence explaining what the future would hold when the real and logical effects of, and let's be clear, everyone agrees that this is a regulation that, as the questioning in the first half of the argument brought out, that would preclude motor carriers from ever using independent contractors. In Massachusetts. In Massachusetts, or indeed in routes that touch on Massachusetts, may cross state lines. You know, the record in this case. That was the other question. Private counsel indicated that it was all within Massachusetts. My understanding is that some of these routes are interstate. Yes, that's correct, Your Honor. Pages 193 and 94 of the record are one of many places where I think the evidence shows that there were individuals based outside Massachusetts who would deliver into Massachusetts, and I believe that the converse is also true. So where do we draw the line under your model? I mean, what if Massachusetts raised the minimum wage law above what you were paying your employees? Would you have to comply with that? I don't think that a minimum wage law of its own force would have the kind of ill and logical effect, you know, that all by itself, no evidentiary showing, the court would declare preempted. In this case, of course, we're challenging Section 148B. Triggering employee status under Section 148B has a host of consequences under Chapter 149. Yes, and we would like, instead of simply references to what the SJC has said, this statute affects in terms of other statutes, we would like each of you, please, to file within one week a briefing that gives us some description of the practical effect of the reach of this. This is oddly absent from the briefs before the court, not to exceed 15 pages. All right? Very good, Your Honor. And as amicus, we would appreciate the help from the Commonwealth on this. And, you know, we can touch on this in the supplemental brief,  employee status themselves have an effect on how prices, routes, and services operate. So, for example, the requirement to post hours in advance under, for example, the Sunday work statute, and the overtime requirement as well. I think my friend has pointed out that these individual plaintiffs are not claiming overtime because of the particular motor vehicles that they drove, but not all FedEx ground drivers are exempt under that 10,000 pound limitation from the overtime laws. How would we apply your analysis? Suppose FedEx decided they wanted the business model of everybody who did any work was an independent contractor for it. How would we get a handle on whether state laws that prevented you from doing that would be preempted? May I answer the question, Your Honor? Yes. I think that you would go first with respect to the transportation of property limitation in the preemption statute, and I think that would be the first order of response to any such concern. Would the Court allow me to say a few words about severability? Yes. I'll be very brief, but I just want to make clear what our position is, and that is that the Court is faced with a choice between two different possibilities, and that the Court cannot, as it said inaccurately, say with confidence, which the legislature would have wanted. Under the common law test, the Court would look at the same substantive question that is brought into prong two right now. So the common law test looked at whether a punitive employee was integral to the operation of the business. If you sever out prong two, you would keep the burden-shifting framework that the plaintiffs like, that is in the beginning of subsection A of section 148B, but you would lose the substance of prong two. That would be out of the analysis. An employer who could satisfy prong one and prong three would categorically not be deemed to be an employer. We think that the choice before the Court is one that is properly left at the legislature. Which did the legislature prefer? Did it prefer the rigorous burden-shifting test that looks at fewer things, or did it prefer the substance of each of the three prongs looked at as it was under the common law? With that, I thank the Court. Thank you. Thank you. The next case, 15-1252, William Remington et al. v. J.B. Hunt Transportation. Yes. I'd like to take a break after this case.